UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

-V-                                                                              CASE NO. 5:25-CR-0289 (GTS)

DAVID HART,

                                 Defendant.

_____

## SENTENCING MEMORANDUM

DATED:       October 22, 2025

                                 Respectfully submitted,

                                 OFFICE OF FEDERAL PUBLIC DEFENDER

                                 Lisa A. Peebles, Esq.
                                 Federal Public Defender
                                 Bar Roll No. 507041
                                 Office of the Federal Public Defender
                                 4 Clinton Square, 3rd Floor
                                 Syracuse, New York 13202
                                 (315) 701-0080

**I.     INTRODUCTION**

David Hart is a 22-year-old man who suffers from intellectual deficits and attention deficit disorder. When he was a child, his IQ scored at 46, and while more recently his IQ scored higher at 69, he still fell within the range denoting an intellectual disability (previously termed "mental retardation"). To this day, David can only read at a 3rd grade level. His low IQ prevents him from processing information and interacting with the world as the average person who can rely on logic and reason, as well as comprehending the fact that some actions have very serious consequences. David is not beyond help, but he does require more support to function properly in society. There are compelling reasons to impose a time-served sentence. As will be discussed more fully below, David's offense conduct is directly related to his intellectual deficits, impulsiveness and emotional immaturity, but his prognosis for future success is great, given his diagnosis and the support services available.

**II.     PRELIMINARY STATEMENT**

David was arrested on March 27, 2024, for Threatening Communications in violation of 18 U.S.C. Section 875(c). Following a detention hearing on April 1, 2024, he was released with a personal recognizance bond under pretrial supervision. On January 7, 2025, David was interviewed to assess his suitability for the PATH diversion program. He was recommended for the PATH program. During March of 2025, David became homeless and wound up in a homeless shelter where he was caught on video using a cellphone that did not belong to him. He also tested positive for marijuana. David's PATH agreement was rescinded. A warrant was issued, he was arrested on June 30, 2025, and has been detained since then.

On July 22, 2025, David pled guilty to a one-count information charging him with Threatening Communications. His sentencing is scheduled for November 19, 2025. A

presentence report was prepared in anticipation of his sentencing, to which the defense has no objections to the facts or guidelines computation. David's total offense level is 13 and his criminal history is I, resulting in an advisory range of 12 to 18 months in prison. He has been in continuous custody for more than 5 months. In this case, even a guidelines sentence can be satisfied by a time-served sentence with a term of supervised release with a condition that substitutes community confinement or home detention for half of the minimum term. The defense maintains that a sentence of time-served with a term of supervised release is more than sufficient to satisfy the statutory purposes of punishment, given the offense conduct and David's unusual characteristics.

### III.   OFFENSE CONDUCT

David was only 20 years old when he committed this offense. His crime involved calling various entities more than 3,000 miles away, claiming to be a social media influencer who had placed bombs and/or other explosives in locations such as hospital bathrooms and the London Bridge. According to the call logs, David told one operator that he had planted a "laser" that would "blow anyone up" who walked by. David also mentioned "proximity bombs," devices that feature prominently in the video game "Call of Duty," a game that David would often play when he could not sleep.[1] Despite these scary-sounding weapons and threats, several operators responding to David's calls indicated that the caller was no real threat. For example, one operator stated that the "caller [was] making constant jabs" and that he felt the caller was "just having a laugh." Another stated that the caller's threats were "not credible and therefore the risk to [law enforcement]" was 'NIL.' " Others note the possibility of mental health concerns. Regarding the possible child in the background during some the calls: while it seems the assumption is that

---

[1] *See* Attachment 1, at 6.

David was screaming at his baby daughter, one operator stated that the child was "older [sic] enough to talk." At the time, David's daughter would have been approximately 14 months old, too young to say more than one or two words.[2] However, and the above-mentioned factors notwithstanding, the actions that David took, and the consequences of those actions, should not be minimized. David now understands that his behavior was not just wildly inappropriate, but also likely caused local law enforcement to divert their attention and significant resources to addressing prank calls. Now that he is receiving adequate mental health treatment and other support, he understands that people could have been hurt, and that is something that he never meant to do. It is worth noting that, at the time of the phone calls, David was not receiving treatment for several of his conditions.

In addition to the cognitive delays he suffers from, David has also shouldered the burdens of depression and anxiety, symptoms that began at least as early as 5th or 6th grade. It is not difficult to imagine how David's inability to understand the world around him, make friends or function in school could have lasting negative impacts on his mental health. Even so, while he was in school, David received support in various ways that helped him manage his behavior. "Upon disconnecting from the education system David was in a vulnerable phase of his life both due to his intellectual limitations and psychological constructs that put him at increased risk of early adult onset of mental illness."[3] Aggravating those limitations is the fact that David also suffers from anxiety-induced periods of insomnia.[4] When his condition is at its worst, David can go days without sleeping. During these periods he often "loses time" and is unable to later recall

---

[2] *See* Communication and your 1- to 2-year-old, Nemours KidsHealth, https://kidshealth.org/en/parents/c12yr.html#:~:text=Most%20kids%20say%201%E2%80%932,much%20of%20what%20you%20say, May 2022 ("Most kids [can only] say 1–2 words by 15 months).
[3] Attachment 1 at 6.
[4] *See generally* Medical Records (Dkt. Nos. 47, 48) and Attachment 2.

what happened for short periods of time. The effects of sleep deprivation are well-documented and alarming. For example, the Centers for Disease Control reports that going just 24 hours without sleep is the cognitive equivalent of someone with a .10% blood-alcohol content.[5] It was in this state that David, playing Call of Duty to pass the time, thought it would be harmless fun to make some prank phone calls.

## IV. BACKGROUND AND CHARACTERISTICS OF DAVID

David is a 21-year-old man who has struggled with mental health issues, coupled with intellectual deficits. He grew up in poverty after his father left his mother when David was only a year old. His mother, Roxanne Ollerenshaw, has mental health problems and collects Social Security disability benefits. She could not provide the support for David's special needs when he was a child and teenager.

To say that David struggled in school is a gross understatement. To this day, he can only read at a 3rd grade level.[6] However, this does not mean that he is beyond help, just that he needs the proper support to be able to function properly in society.[7]

In addition to his intellectual disability, David was also diagnosed with attention deficit disorder.[8] To manage his symptoms, and with the support of his friends and family, most notably his mother, David was treated in the past and was prescribed Ritalin, Citalopram and Clonidine as part of his medication treatment. While some would glaze over these diagnoses, considering

---

[5] *See NIOSH Training for Nurses on Shift Work and Long Work Hours*, National Institute for Occupational Safety and Health, Centers for Disease Control, Last Reviewed Oct 16, 2023, https://www.cdc.gov/niosh/work-hour-training-for-nurses/objectives.html. While the article discusses nurses working long shifts, the statistic reported is of general sleep deprivation and not specific to occupation of nursing.
[6] *See* Community Health & Behavioral Services ("CHBS") Records, April 4, 2024, at 6, Medical Records filed separately (Dkt. No. 47).
[7] *See* Attachment 1, at 4-5 [Current and Proposed Services]).
[8] See CHBS Records, May 20, 2024, at 2, Medical Records filed separately (Dkt. No. 48).

them part of an over-diagnosed generation, this is David's reality, and these diagnoses have hindered his development at every step and contributed to behavior that many neurotypical people would consider bizarre and possibly dangerous. But David is not a dangerous person. Even those directly affected by some of his most problematic behaviors have known almost immediately that he is no real threat.

For example, and discussed more fully below, it was clear to several people involved in the situations that form the basis for the instant charges that David did not truly mean to harm anyone. It was even clear to the elderly woman involved in the 2020 incident on the Hamilton College campus, an incident that is referenced in the PSR, that he was not dangerous. The complainant, who was walking alone at an hour when there were not as many people around as usual, said that, despite his ridiculous attempt to scare her, she "didn't feel like he was enough of a threat to her" to engage with him physically in any way.[9] She also reported feeling that David seemed "troubled," and did not want to press charges.[10]

Notably, David was only 16 at the time, placing him in the precise category of defendants the United States Sentencing Commission considered when it amended Section 5H1.1 of the United States Sentencing Guidelines ("USSG").[11] In deeming youth as a relevant offender characteristic to be considered at sentencing (including when considering prior bad conduct), the Commission relied upon research indicating "that brain development continues until the mid-20s."[12] To put it in perspective, even if fully formed, David's mind would still function as a

---

[9] *See* Incident Report, (9) Vitim Re-Interview, August 22, 2020, end of paragraph 1, attached hereto as Attachment 2.
[10] *Id.*
[11] *See Proposed Amendments to the Sentencing Guidelines*, United Sates Sentencing Commission, December 26, 2023, at page 15 [*Sentencing Youthful Individuals* and *Studies on Age and Brain Development*]), attached hereto as Attachment 3.
[12] *Id.*

child's in many ways (such as reading at a 3rd grade level). At the time of the Hamilton College incident, he was still an actual child whose brain had not yet fully formed.

### V.  A Time-Served Sentence Would Satisfy the Need for the Punishment to Reflect the Seriousness of the Offense and Promote Respect for the Law.

Section 3553(a)(2)(A) instructs the Court to craft a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. A punishment is 'just' insofar as it 'fit[s] the crime,' and 'reflect[s] the gravity of the defendant's conduct.' *Simon v. United States*, 361 F.Supp. 2d 35, 43 (D.D.N.Y. 2005).  (quoting S.Rep. 98-225, 1984 U.S.C.C.A.N. 3182, 3258-59). Senate Report 98-225 explained that the 3553 factors are:

> Another way of saying that the sentence should reflect the gravity of the defendant's conduct. ***From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense***, and the public interest in preventing a recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

David has struggled throughout his incarceration at the local county jail. His anxiety and nervousness have exacerbated his alopecia. This condition causes his hair to fall out, not only on his head, but his eyebrows and facial hair have bald patches. He has been an emotional wreck while in custody. He describes his mind as constantly racing. Given his deficits and gullibility, he's been an easy target for manipulation and false information provided by other inmates. He is easily confused by conflicting advice he receives from fellow inmates. The talk from other inmates has exacerbated his anxiety. The uncertainty of what will happen to him has been an impactful deterrent from committing any future transgressions.

Despite his anxiety, David has taken advantage of educational opportunities offered at the Oneida County Jail using an iPad. He completed Anger Management, Parenting and GED courses, et al. *See* Attachment 4, Official Transcript for David Hart. He is committed to making a better life for himself.

### VI.   David's Remorse and Low Risk of Recidivism Support a Sentence of Time Served

The Court then considers future dangerousness. 18 U.S.C. Section 3553(a)(2)(C). The United States Sentencing Commission has expressed the "likelihood of recidivism and future criminal behavior must be considered" to protect the public. U.S. Sentencing Guidelines Manual, Chapter Four, Introductory Commentary.  The Commission has found that offenders without prior arrests have the lowest recidivism rate of all other offenders.  *See* U.S. Sentencing Commission, *Recidivism and the "First Offender"* 13-14 (May 2004) [hereinafter "Recidivism Report"]. Courts have similarly reasoned that incarceration would have a greater significance for a defendant with no incarceration history.  In this case, David has struggled mightily during his incarceration.

Despite his violations while under pretrial supervision, David made substantial progress. He cooperated with his pretrial release, and, despite not having a driver's license (more proof of his difficulty navigating adult life), he doggedly pursued employment opportunities, attended numerous mental health sessions and life skills trainings, and even completed the penultimate requirement to join his local volunteer firefighter squad. His success over several months is proof that David can not only abstain from criminal behavior, but that he can truly become a contributing member of society. In therapy, David describes himself as "[a] loving dad" who wants to "[t]ake good care of [his] family." And, based on his commitment to take full advantage

8

of all the supports now available to him, he will be able to do that if given the chance. In May 2024, one of David's therapists reported that he "appeared to respond well [to treatment therapies] based on his active engagement."[13] With Mitigation Specialist Walker's help, David will benefit from numerous additional social supports through, for example, the Office of People with Developmental Disabilities upon his release from imprisonment.[14]

Prior to his arrest for violating his conditions, he found employment with Tractor Supply Company. He was grateful to have a job he enjoyed and the thought of squandering that opportunity was upsetting to him. David believes his employer is holding his job open for when he is released from custody. In this case, David is deeply sorry for his conduct. He has no interest in ever engaging in such behavior in the future and is committed to doing the right thing once he is released from custody. He has the support he needs to be successful.

## VII. CONCLUSION

Based upon the foregoing, the defense respectfully requests this Court impose a time-served sentence, along with a term of supervised release. This sentence would satisfy the statutory purposes of punishment, as required by 18 U.S.C. Section 3553(a).

DATED: October 22, 2025

LISA A. PEEBLES
FEDERAL PUBLIC DEFENDER
By: /s/Lisa A. Peebles, Esq.
Bar Roll No. 507041
Clinton Exchange, 3rd Floor
4 Clinton Street
Syracuse, New York 13202
(315) 701-0080

cc: Matthew McCrobie, AUSA (by CM/ECF)

---

[13] *Id.*
[14] *See* Attachment 1 at 4-5.